MAINTENANCE ENGINEERS, Plaintiff,

v.

UNITED STATES, Defendant.

No. 01–25C.

United States Court of Federal Claims.

Oct. 17, 2001.[1]

1. This opinion was originally issued and filed under seal on August 28, 2001. The parties were directed to advise the court regarding any portions of the opinion that should be redacted prior to publication. The defendant notified the court that the parties agreed that certain portions of the opinion should be redacted. The court agreed, and redacted the material denoted by the parties. Redactions are indicated by the word REDACTED in brackets.

Timothy H. Power, Walnut Creek, California, attorney of record for the plaintiff.

Marian E. Sullivan, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., Deborah

A. Bynum, Assistant Director, and David M. Cohen, Director, for the defendant.

## OPINION

HORN, Judge.

This action comes before the court on Maintenance Engineers's (Maintenance) post-award bid protest requesting preliminary injunctive and permanent injunctive relief for damages allegedly incurred as a result of deficiencies in the contract award process for RFP (request for proposals) No. N68711–00–R–7603 [2] for grounds maintenance and landscaping at eleven Navy facilities in San Diego County, California. On January 16, 2001, the plaintiff filed its complaint with this court alleging that the Navy's use of an unstated technical evaluation subfactor violated the Competition in Contracting Act (CICA), Pub.L. No. 98–369, 98 Stat. 1175 (codified as amended in scattered sections at 10, 31 and 41 U.S.C.) and the Federal Acquisition Regulation (FAR), 48 C.F.R. Part 15 (2000), that the Navy's evaluation of experience and past performance was unreasonable, arbitrary and capricious and that the failure to produce documentation of the evaluation of proposals prevented any determination of the reasonableness of the Navy's decision to award to Miranda's Landscaping, Inc. (MLI). The record of the evaluation process was later produced to the plaintiff, and the plaintiff revised its argument, conceding that the defendant had produced the evaluation documentation, but arguing that the evaluation record showed that the evaluations and recommendations made by Navy officials were "unreasonable and unsupported by the facts in the record" and that "the information submitted to the Source Selection Authority was misleading, erroneous, and incomplete which makes the award decision unreasonable and an abuse of discretion." According to the plaintiff's complaint, the plaintiff sought a judgment declaring that the evaluation of the proposals was improper, a preliminary injunction preventing the Navy from allowing the awardee to begin performance on the contract and a permanent injunction directing that the award be set aside, that the Navy re-evaluate the proposals consistent with the solicitation, and that the Navy make an award consistent with that re-evaluation.

On January 17, 2001, the court held a hearing on the preliminary injunction requested by the plaintiff. After consideration of the arguments presented by both parties, on January 18, 2001, the court denied plaintiff's motion for a preliminary injunction. Subsequently, the parties designated an administrative record and filed cross-motions for judgment on the administrative record, on which the court bases its review of the Navy's actions.

## FINDINGS OF FACT

On May 24, 2000, the Navy issued an RFP through solicitation No. N68711–00–R–7603 for grounds maintenance and landscaping at eleven different Navy facilities in San Diego County, California. The RFP at issue represented a consolidation of work previously performed under seven separate contracts. The plaintiff, Maintenance Engineers, held two of the previous seven contracts. These two contracts had a total contract value of $3,475,753.13. The procurement at issue was a set-aside for small business and contemplated a firm fixed-price, indefinite quantity contract with one base year and four one-year options. The contracting officer issued five amendments to the solicitation to extend the deadline for the submission of offers and to answer the contractors' questions about the solicitation. None of these amendments changed the evaluation criteria established in the solicitation, and none are at issue in the present case. Section M.2 of the solicitation provided that "[o]fferors are cautioned with [sic] award hereunder *may* be effected without discussions. Initial proposals should, consequently, present the best offer to the Government." (emphasis in original).

The solicitation directed offerors to submit their proposals in two separate volumes: (1) Non–Price (Technical and Management) Proposal and (2) Price Proposal. Section M.4 of

---

**2.** In the complaint, the plaintiff uses both the numbers N68711–00–R–7603 and N68711–00–R–7693. The administrative record, however, contains a copy of the solicitation, offer and award document which bears the number N68711–00–R–7603.

the solicitation provided an overview and explained the relative importance of the evaluation factors, as follows:

(a) *OVERALL EVALUATION.* The technical evaluation factors, when combined, are approximately equal in importance to price. It is the Government's intent to procure these services on a best-value basis. Based on the Government's past experiences with similar jobs, a Contractor's experience and past performance, technical approaches and quality have been found to be as important as price. Due to the Contractor's direct interface with the various Naval Activities serviced through this contract, and the high visibility of the areas to be maintained, a well-qualified Contractor may save the Government significant time and expense when compared to a Contractor who may offer a lower price for services of lower or marginal quality.

(b) *TECHNICAL FACTORS.* The following factors will be evaluated:

FACTOR A: Experience/Past Performance

SUBFACTOR A1—Specific grounds experience and past performance

FACTOR B—Management/Administration Plan

SUBFACTOR B1—Management Plan for Work Accomplishment

SUBFACTOR B2—Detailed Information for Achieving Horticultural Goals

(c) *RELATIVE IMPORTANCE OF EVALUATION FACTORS:*

(1) Subfactors B1, and B2 are of equal importance.

(2) When combined, the Subfactors under Factor B are of some what [sic] lesser value than the Subfactor under Factor A, making Factor A more important than Factor B.

(3) If the technical differences among competing offers are significant, but the differences in prices are insignificant, then technical factors will be the most influential factors in determining best value.

(4) Price is approximately equal in importance to the technical evaluation factors, combined. Prices will be evaluated for reasonableness.

(5) If technical differences among proposals are insignificant, but price differences are significant, then price will be the most influential factor.

Section M.5 listed the past performance factors to be evaluated: (1) Quality of Work/Services; (2) Timeliness of Performance; (3) Customer Satisfaction; and (4) Reasonableness and Cooperativeness exhibited during contract performance. In addition, the instructions for the preparation of the Non–Price Proposal were established in section M.8 and included the following:

The following information shall be included in Volume 1 of your proposal. This information is required to facilitate an evaluation and comparison of your qualifications with other firms submitted [sic] proposals:

*FACTOR A: CONTRACTOR EXPERIENCE/PAST PERFORMANCE*

(1) *SUBFACTOR A1: Specific Grounds Experience and Past Performance:*

An evaluation of the offeror's past performance and experience will be performed by the Government. The evaluation of past performance will include an assessment of the offeror's past quality of work, timeliness of performance, commitment to customer satisfaction, and reasonableness and cooperativeness exhibited during contract performance.

(i) Provide a listing of all grounds and landscape maintenance contracts or projects within the last three years in which the offeror participated as prime contractor or subcontractor. For each item listed, identify whether the offeror was a prime contractor or subcontractor.

(ii) For each contract or project identified in paragraph (i) above, provide contract/project numbers and procuring agencies, the contract amount/price, name and telephone number of administering agency's Contracting Officer and technical point of contact, exact location(s) of where work was performed, contract performance period, performance evaluation for each listed

contract and description of the services provided.

On August 2, 2000, the contracting officer received eight proposals. In accordance with the source selection plan, the Technical Evaluation Board (TEB) evaluated the Non–Price Proposals. Using the lists of past contracts provided by the offerors, the contracting officer sent past performance questionnaires to all of the contracting officials who had worked with the bidders on prior contracts, requesting information regarding various aspects of the bidders' past performance. The past performance questionnaires directed respondents to rate the contractors on eleven aspects of performance and to assign a rating of Highly Acceptable, Acceptable, Marginal, or Unacceptable for each aspect of performance. The Navy did not receive back completed questionnaires from all the contracting officials who were sent questionnaires. The Navy also searched the Contract Performance Assessment Report System (CPARS), a database containing past evaluations of government contractors, for past performance information on all the bidders. The CPARS contained reports for some offerors and for some past contracts, but not for others.

After the contracting officer collected the returned past performance questionnaires and the CPARS reports, the TEB reviewed the bidders' Non–Price proposals. Three individual evaluators reviewed the Non–Price Proposals and provided three separate evaluations. Each evaluator rated each of the three technical subfactors (Experience/Past Performance, Management Plan, and Information for Achieving Horticultural Goals) on a five-point rating scale which included possible ratings of Exceptional, Very Good, Acceptable, Marginal, or Unacceptable. The three evaluators then collaborated to compile a summary of each contractor's ability with respect to each technical sub-factor and to assign a final rating for each technical subfactor, as well as a final overall technical rating from the TEB.

Maintenance listed six contracts in the experience/past performance section of its proposal. Past performance questionnaires were sent to each of the six contracting

officials, and two officials returned the completed questionnaire regarding Maintenance's performance. The two past performance questionnaires received regarding Maintenance's past performance were from the Federal Law Enforcement Training Center and the ROICC Point Loma. These two questionnaires contained five "Highly Acceptable" ratings, sixteen "Acceptable" ratings, and one "Marginal" rating. The respondent for the ROICC Point Loma contract provided the following general comments: "Brad Herman, Maintenance Engineers Project Manager, has always been conscientious and responds to the government's changes in an expedient and positive manner with the end customer in mind. The company has been a pleasure to work with." The Federal Law Enforcement Training Center questionnaire respondent, however, described a perceived weakness in Maintenance's performance by stating: "The contractor has good equipment and can do the work but sometimes especially during the summer months, he doesn't appear to have enough employees to get the work done per contract." The Federal Law Enforcement Training Center respondent also indicated that the contracting official had suspended payments to Maintenance and stated, "Suspension of payments—several times since contract start (not this year). Contractor not fully complying with contract requirements."

The contracting officer in this case also obtained two CPARS reports regarding Maintenance's past performance. These reports provided information on the Naval Station 32nd Street, San Diego, California contract, for two different time periods. The two reports combined evaluated work performed from April 1, 1998 through September 30, 1999 and provided a total of fourteen ratings on seven aspects of performance. Maintenance received [REDACTED]. The CPARS report evaluating Maintenance's performance from April, 1998 through March, 1999 included the following comments: [REDACTED] The CPARS report for April, 1999 through September, 1999 stated: [REDACTED]

After considering all the information available regarding Maintenance's past perfor-

mance/experience, all three evaluators individually rated Maintenance as "Acceptable" in the past performance/experience sub-factor. Among other comments, all three evaluators noted that Maintenance had been issued a cure notice and that Maintenance, in its Non–Price proposal, had provided the total price of its former contracts instead of the yearly award price. In the TEB's summary of Maintenance's experience/past performance, the TEB included the following comments: "PP [Past performance] shows he meets requirements minimally.... Experience is there. No P.O.C. [technical point of contact].... Does have cure notice and suspension of payment. Improvement needed in documentation; Good communication. PPQ [Past performance questionnaire] comments show sign of risk." (strike out in original). One response to a past performance questionnaire indicated that Maintenance had payments suspended during one contract, but there is no evidence in the record which demonstrates that Maintenance, in fact, had been issued a cure notice.

The TEB gave Maintenance ratings of "Very Good" for the other two technical subfactors, Management Plan for Work Accomplishment and Detailed Information for Achieving Horticultural Goals. After considering the information provided regarding all three technical subfactors, the TEB assigned Maintenance an overall technical rating of "Acceptable" and explained its rationale with the following comments: "TEB considered VG but weakness and confusion in his proposal showed some risk. Negative comments, cure note and suspension of pay warranted an Acceptable overall rating. Experience appears to be there. Gold plating on evals was evident. He shows probability of success. Confusing evals and contract value. Showed no flexibility."

The awardee, Miranda's Landscaping, Inc. (MLI), identified seven past contracts in its Non–Price Proposal. Four of the seven past performance questionnaires distributed by the contracting officer were completed and returned. Completed past performance questionnaires regarding MLI's past performance were received from contracting officials from the United States Coast Guard Island, Alameda, CA, the 30 CES/CEDEC VAFB, CA, ROICC Camp Pendleton, and the OICC, NWS Seal Beach, Seal Beach, CA contracts. The four completed questionnaires indicated that out of the forty-four total ratings given on various aspects of performance, MLI received thirty-nine "Highly Acceptable" ratings and five "Acceptable" ratings. In addition, the respondent from the United States Coast Guard offered the following comments: "Miranda's is an outstanding contractor. Employees know what is going on and are willing to suggest ways to do things more efficient [sic]. Very customer focused and work very well independantly [sic]." Additionally, the contract specialist from the OICC, NWS Seal Beach contract stated: "Ktr [Contractor] has performed Grnds [Grounds] Maint at MCAS El Toro for the past 5 yr. until and shortly after base closure with a great deal of efficiency and consistency to do a good job. Would work weekends if necessary to keep things on track especially around Air show time." The respondent from the 30 CES/CEDEC VAFD contract noted that MLI had committed "[o]nly minor infractions" and rated MLI's quality of work as "Highly Acceptable." The contract specialist on the ROICC Camp Pendleton contract indicated that MLI had been "issued a cure notice, but responded effectively to solve the problem. No other notices were issued after the cure notice." This same contract specialist also gave MLI "Highly Acceptable" ratings in eight of the eleven categories and concluded the questionnaire by stating, "[c]ontractor was very cooperative, responsive, and highly qualified. Miranda's was a pleasure to work with." A search of the CPARS database did not result in any CPARS reports regarding MLI's past performance.

Upon review of all the past performance information for MLI, two of the individual evaluators noted MLI's failure to indicate whether it had served as the prime contractor or the subcontractor as a weakness in its Non–Price proposal. All three evaluators, however, wrote consistently positive comments in their past performance/experience reviews. Regarding MLI's past contracts, one of the evaluators noted that "contracts were above this contract value—8 mil (was

one)." All three of the individual evaluators rated MLI's experience/past performance as "Exceptional." In the TEB's summary of experience/past performance, the TEB gave MLI an overall rating of "Exceptional" with the following rationale: "Past Performance/Exp—indicates contracts over 2 mil $ .... Comments very positive. Information/Narrative clear/concise. With exception of sub/prime labels we could determine he was prime from PPQ's [past performance questionnaires]. Provided all information orderly, has outstanding probability of success." The TEB evaluated MLI's proposal with respect to the other two technical subfactors and assigned MLI "Exceptional" ratings for both of the remaining subfactors. In the TEB's summary of MLI's overall technical ability, the TEB provided, "KTR shows commitment, professionalism, extensive knowledge in all aspects and factors. Outstanding ratings are consistent. Horticulturally committed to current understanding providing gov't w/ professional service." The TEB's review of MLI's Non–Price Proposal, including the past performance questionnaires received, resulted in an overall technical rating of "Exceptional."

On September 15, 2000, after the technical evaluations of all the bidders had been completed, the TEB issued a report in which it summarized its findings and the ratings assigned to each proposal. The TEB report compared all eight of the technical proposals, ranking MLI first, and Maintenance second. The TEB concluded that both of the proposals submitted by MLI and Maintenance "are considered clearly technically acceptable" and "can be considered for award." The TEB, however, determined that the remaining six proposals "did not reflect a clear understanding of all the contract requirements" and "should not be considered for award unless further discussions are allowed." The TEB reported to the contracting officer that it had rated MLI as "Exceptional" in all three subfactors and had given MLI an overall rating of "Exceptional." Regarding MLI's experience/past performance, the TEB summarized its rationale behind MLI's "Exceptional" rating as follows:

> The contractor provided a listing of seven grounds maintenance contracts or projects. Past performance included six contracts in the multi-million dollar range of $9 million, $8.5 million, $3.7 million, $2.9 million, $2.8 million and $2.4 million. Four past performance questionnaires were received from references provided. All four ratings received were Highly Acceptable. The Contracting Officer utilized the Government's Contractor Performance Assessment Report System (CPARS) database; however, no past performance information was obtained from this system. The past performance and experience provided demonstrates the Contractor's exceptional ability to meet or exceed the performance requirements of a contract of this size, nature and scope.

On the other hand, the TEB Report indicated that Maintenance had received a rating of "Acceptable" for the experience/past performance subfactor and ratings of "Very Good" for the two management and administration subfactors. The TEB also reported Maintenance's overall technical rating of "Acceptable." In the subfactor in which Maintenance received its lowest rating, the experience/past performance subfactor, the TEB explained that:

> The contractor provided a listing of six grounds maintenance contracts or projects. Past performance within the past three years included contracts varying in size from $2.5 million, $1.8 million, $1.7 million, $1.5 million, $1.3 million and $1.1 million. Two past performance questionnaires were received from references provided and two Contractor Performance Assessment Reports from the Government's Contractor Performance Assessment Report System (CPARS) database. All four ratings received were Acceptable; however, one comment received on a questionnaire stated the contractor had received several payment suspensions since contract start as a result of the inability to comply with contract requirements. This is considered a minor weakness by the TEB. The past performance and experience provided demonstrates the Contractor's ability to meet the performance requirements of contracts of that size, nature and scope; however, the experience was of lesser value and

magnitude compared to the value and size of this contract.

The contractor ranked third by the TEB, Saturn Landscape Plus Inc (SLPI), received a rating of "Very Good" for experience/past performance, but received "Marginal" ratings for the other two technical subfactors, resulting in an overall rating of "Marginal." The record indicates that two past performance questionnaires were received regarding SLPI's past contracts and that these two questionnaires showed mostly ratings of "Highly Acceptable." However, two of the TEB evaluators noted that SLPI had failed to provide a technical point of contact for certain prior contracts. In addition, the TEB report indicated that SLPI's "[p]ast performance included contracts varying in size from $1.6 million, $1.3 million, $704 thousand, and $717 thousand" and concluded that SLPI's "experience was of a substantially lower value and magnitude compared to the value and size of this contract."

Maintenance submitted a price proposal of $13,993,580.00 compared to MLI's price proposal of $15,121,075.10, both after minor corrections, to cover the base period and four option years. On September 18, 2000, the contracting officer presented the business clearance memorandum to the source selection official, which incorporated the TEB report in its entirety and reported the results of the price analysis. The contracting officer's price analysis reflected a determination regarding all eight bids, finding that "offerors' prices were reasonable and balanced" and that "all the offerors' proposals appears [sic] to be realistic." The business clearance memorandum also detailed the price/technical factors trade-off analysis by stating:

> The Source Selection Board recommends that it is in the best interest of the Government to award Contract N68711–00–D–7603 without discussions to Miranda's Landscaping Inc (MLI). MLI's proposal clearly offers the best value to the Government. MLI's proposal has been determined to be strong and comprehensive in detail with an outstanding probability of success in the administration and quality control functions. As a result of exceptional past performance and experience in con-

tracts of similar size, nature and scope of this requirement, an award made to MLI would result in less change orders; eventual savings in administrative costs and no known risks to the Government. In comparision with Maintenance Engineers (ME), the only proposal with an Acceptable rating overall, ME's past performance and experience were with projects of lesser value in comparison to MLI's.... Although ME's management plan was strong, the TEB felt it contained both minimal and minor weaknesses that would place risk on the Government if an award was made to ME. It is important to remember the significant investment that the Government has invested in regards to landscaping and maintenance of grounds for the following areas: .... If the Government took the risk to award to ME and if they didn't succeed in the administration and quality control, any damage that might occur to the landscape of all the areas would result to increasing the Governments [sic] administrative costs....

Between the two proposals rated Acceptable or above (i.e., of the two proposals which clearly meet or exceed the Government's minimal technical requirements), MLI's proposal offers the highest technical quality as explained above. Further, the quality advantages of the MLI proposal, as outlined above and as further detailed in the TEB report, are worth more than the additional $1.1 million dollar cost (approximately, over the five year maximum potential life of the contract) in comparision [sic] to the proposal of ME. Given MLI's exceptional technical quality and very competitive price, discussions are unnecessary. If the Government opened discussions with all offerors, the offerors whose prices are lower than Miranda would not be able to improve their technical proposals enough to displace Miranda as the overall best value to the Government; the gap in technical quality is simply too great.

The business clearance memorandum also contained the following chart of the TEB's ratings:

| EVALUATION FACTORS | MLI 1 | ME 2 | LPI 3 | ALI 4 | ETM 5 | LSC 6 | NMS 7 | YNE 8 |
|---|---|---|---|---|---|---|---|---|
| A: Past Performance/ Experience | Exceptional | Acceptable | Very Good | Acceptable | Acceptable | Marginal | Marginal | Marginal |
| B: Management/ Administration Plan | Exceptional | Very Good | Marginal | Marginal | Marginal | Marginal | Marginal | Marginal |
| OVERALL RATING | Exceptional | Acceptable | Marginal | Marginal | Marginal | Marginal | Marginal | Marginal |

On September 18, 2000, the source selection official adopted the recommendation set forth in the business clearance memorandum, thereby approving the award of Contract No. N68711–00–D–7603 to MLI in the amount of $15,121,075.10, without discussions. The contracting officer endorsed the source selection official's decision by awarding the contract to MLI. By letter dated September 18, 2000, the contracting officer notified Maintenance that the government would not consider subsequent revisions to the offerors' proposals and that RFP No. N68711–00–R–7603 had been awarded to MLI.

On September 19, 2000, Maintenance filed a protest with the General Accounting Office (GAO), arguing that MLI "is not a small business concern." On September 25, 2000, the United States Small Business Administration issued a size determination, finding that MLI met the standard for a small business eligible for award. After Maintenance's request for a debriefing on September 19, 2000, the contracting officer held a post award debriefing on September 25, 2000. At the debriefing, the contracting officer revealed the TEB's technical evaluation of Maintenance and explained that "the SSB [Source Selection Board] and SSA [Source Selection Authority] looked at the difference in price [between Maintenance and MLI] to be minimal."

On September 29, 2000, Maintenance submitted another protest to the GAO, alleging that "the agency did not seek clarification of an ambiguous past performance response from another agency and did not give [M]aintenance Engineers an opportunity to comment on the ambiguous reference" and that "the agency did not properly apply the evaluation factors and the evaluation criteria in the solicitation." Because the GAO found that the issues raised by plaintiff were either abandoned or untimely filed, the GAO dismissed Maintenance's protest on November 28, 2000. On January 16, 2001, the plaintiff filed its complaint with this court, requesting a preliminary injunction and a permanent injunction. On January 18, 2001, the court denied plaintiff's request for a preliminary injunction. The awardee, MLI, was scheduled to begin performance on February 1, 2001. The court now considers the plaintiff's request for a permanent injunction.

## DISCUSSION

### I. Motion for Judgment on the Administrative Record

The parties have submitted cross-motions for judgment on the administrative record regarding plaintiff's request for a permanent injunction. Rule 56.1(a) of the Rules of the United States Court of Federal Claims (RCFC) dictates that such motions are reviewed under the same standards as are motions for summary judgment under RCFC 56(a). See *Rust Constructors Inc. v. United States*, 49 Fed.Cl. 490, 493 (2001); *WorldTravelService v. United States*, 49 Fed.Cl. 431, 438 (2001); *Nickerson v. United States*, 35 Fed.Cl. 581, 588 (1996), *aff'd*, 113 F.3d 1255, 1997 WL 177509 (Fed.Cir.1997) (table). RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ. P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed.Cir.), *reh'g and reh'g en banc denied* (2001); *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed.Cir.2001); *Avenal v. United States*, 100 F.3d 933, 936 (Fed.Cir.1996), *reh'g denied* (1997); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed. Cir.1994). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d at 1257; *Curtis v. United States*, 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Johnson v. United States*, 49 Fed.Cl. 648, 651 (2001); *Becho, Inc. v. United States*, 47 Fed.Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.*, 998 F.2d 979, 982 (Fed.Cir.), *reh'g denied, en banc declined* (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment:

> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States*, 23 Cl.Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.*, 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds*, 970 F.2d 890 (Fed.Cir.1992); *United States Steel Corp. v. Vasco Metals Corp.*, 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505; *Eli Lilly and Co. v. Barr Labs., Inc.*, 251 F.3d 955, 971 (Fed. Cir.), *reh'g and reh'g en banc denied* (2001); *Gen. Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1353 (Fed.Cir.1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues, must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. at 587–88, 106 S.Ct. 1348; *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d at 1257; *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied* (1998).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d

265 (1986); *see also Trilogy Communications, Inc. v. Times Fiber Communications, Inc.,* 109 F.3d 739, 741 (Fed.Cir.) (quoting *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied* (1995)), *reh'g denied, en banc suggestion declined* (1997); *Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Am. Airlines v. United States,* 204 F.3d 1103, 1108 (Fed. Cir.2000); *see also Schoell v. Regal Marine Indus., Inc.,* 247 F.3d 1202, 1207 (Fed.Cir. 2001).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the non-moving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. *Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)); *Chevron USA, Inc. v. Cayetano,* 224 F.3d 1030, 1037 n. 5 (9th Cir.2000), *cert. denied* — U.S. ——, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also*

*B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d 587, 593 (6th Cir.2001); *Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed.Cir. 1997). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. *B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d at 593; *Atl. Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir.2000); *Allstate Ins. Co. v. Occidental Intern., Inc.,* 140 F.3d 1, 2 (1st Cir.1998); *Reading & Bates Corp. v. United States,* 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *De-Marini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1322 (Fed.Cir.2001); *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1338–39 (Fed.Cir.2001). After reviewing the parties' submissions, the court finds that there are no material facts in dispute. Therefore, disposal of the case before the court on cross-motions for judgment on the administrative record is appropriate.

## II. Standard of Review

The plaintiff has filed a protest requesting the court to issue a permanent injunction directing the Navy to re-evaluate the proposals of MLI and Maintenance to permit correction of the alleged errors committed by the agency in the original evaluation process. The plaintiff seeks a new award based upon such re-evaluation to the plaintiff.

The Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996), amended the Tucker Act and also provided the United States Court of Federal Claims with post-award bid protest jurisdiction for actions filed on or after December 31, 1996. *See* 28 U.S.C. § 1491(b)(1)-(4) (1994 & Supp. II 1996). The statute provides that post-award protests of agency procurement decisions are to be reviewed under the Administrative Procedure Act (APA) standards, making the standards outlined in *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970) and the line of cases following that decision

applicable. *See Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir.2001).

Agency procurement actions, therefore, should be set aside when they are determined to be "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "(D) without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2000); *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332; *RAMCOR Servs. Group, Inc. v. United States,* 185 F.3d 1286, 1290 (Fed.Cir.1999).

■ In *Impresa Construzioni Geom. Domenico Garufi v. United States,* the court wrote:

> Under the APA standards that are applied in the *Scanwell* line of cases, a bid award may be set aside if either: (1)[T]he procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.... When a challenge is brought on the first ground, the courts have recognized that contracting officers are "entitled to exercise discretion upon a broad range of issues confronting them" in the procurement process. *Latecoere Int'l, Inc. v. United States Dep't of Navy,* 19 F.3d 1342, 1356 (11th Cir.1994). Accordingly, the test for reviewing courts is to determine whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," *id.,* and the "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 456 (D.C.Cir.1994). When a challenge is brought on the second ground, the disappointed bidder must show "a clear and prejudicial violation of applicable statutes or regulations." *Kentron [Hawaii, Ltd. v. Warner,]* 480 F.2d [1166,] 1169 [ (D.C.Cir. 1973) ]; *Latecoere,* 19 F.3d at 1356.

*Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332–33 (certain citations omitted); *see also OMV Med., Inc. v. United States,* 219 F.3d 1337, 1343 (Fed.Cir.2000).

■ A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. *See Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 995, 996 (Fed.Cir.1996); *Wilner v. United States,* 24 F.3d 1397, 1413 (Fed.Cir.1994) (dissenting on other grounds); *Labat–Anderson Inc. v. United States,* No. 01–350C, 2001 WL 862686, at *8 (Fed.Cl. July 27, 2001); *Emery Worldwide Airlines, Inc. v. United States,* 49 Fed.Cl. 211, 222 (2001); *Dynacs Eng'g Co. v. United States,* 48 Fed. Cl. 614, 619 (2001); *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388, 392 (1999), *appeal dismissed,* No. 00–5028, 6 Fed.Appx. 867, 2001 WL 267859 (Fed.Cir. Mar.6, 2001). The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [I]f the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also Mantech Telecomms. and Info. Sys. Corp. v. United States,* 49 Fed.Cl. 57, 64 n. 8 (2001).

■ Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43, 103 S.Ct. 2856. "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir. 1989) (quoting *M. Steinthal & Co. v. Sea-*

*mans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)); *see also Cybertech Group, Inc. v. United States,* 48 Fed.Cl. 638, 646 (2001). As stated by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted); *see also Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), *reh'g denied,* 420 U.S. 956, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975); *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1058 (Fed.Cir. 2000) ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. at 285, 95 S.Ct. 438)); *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955, 959 (Fed. Cir.1993); *Mantech Telecomms. and Info. Sys. Corp. v. United States,* 49 Fed.Cl. at 63; *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. at 392 ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985))); *Redland Genstar, Inc. v. United States,* 39 Fed.Cl. 220, 231 (1997); *Mike Hooks, Inc. v. United States,* 39 Fed.Cl. 147, 154 (1997); *Cincom Sys., Inc. v. United States,* 37 Fed.Cl. 663, 672 (1997); *Commercial Energies, Inc. v. United States,* 20 Cl.Ct. 140, 145 (1990) ("In simple terms, courts should not substitute their judgments for pre-award procurement decisions unless the agency clearly acted irrationally or unreasonably." (citations omitted)).

Similarly, in *E.W. Bliss Co. v. United States,* the United States Court of Appeals for the Federal Circuit offered guidance on the applicable standard of review:

Procurement officials have substantial discretion to determine which proposal represents the best value for the government. *See Lockheed Missiles & Space Co., Inc. v. Bentsen,* 4 F.3d 955, 958 (Fed.Cir.1993); *cf. Widnall v. B3H,* 75 F.3d 1577 (Fed. Cir.1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is "grounded in reason ... even if the Board itself might have chosen a different bidder"); *In re General Offshore Corp.,* B–251969.5, B–251969.6, 94–1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 248, at 3 (Apr. 8, 1994) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award. Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted). Bliss has not shown that the Mint abused its discretion in awarding the contract to Pressmasters.

\* \* \*

Bliss' [other challenges to the procurement] deal with the minutiae of the procurement process in such matters as technical ratings ... which involve discretionary determinations of procurement officials that a court will not second guess. *See Lockheed Missiles & Space Co.,* 4 F.3d at 958; *Grumman Data Systems Corp. v. Widnall,* 15 F.3d 1044, 1048 (Fed.Cir.1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement."); ...

*E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996); *see also JWK Int'l Corp. v. United States,* 49 Fed.Cl. 371, 388 (2001).

■ The solicitation in the above-captioned case contemplated a negotiated procurement, in which contracting officers are generally afforded even greater decision making discretion, in comparison to their role in sealed bid procurements. "It is well-established that contracting officials are accorded broad discretion in conducting a negotiated procurement ...." *Hayes Int'l Corp. v. United States,* 7 Cl.Ct. 681, 686 (1985) (citing *Sperry Flight Sys. v. United States,* 212 Ct.Cl. 329, 339–340, 548 F.2d 915 (1977)); *see also Cybertech Group, Inc. v. United States,* 48 Fed.Cl. at 646 ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 726 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir.1988). In *Burroughs Corp. v. United States,* the court described the broad discretion afforded a contracting officer in a negotiated procurement as follows:

> Remarking on the contracting officer's discretion in negotiation the court in *Sperry Flight Systems Division v. United States,* 212 Ct.Cl. 329, 339, 548 F.2d 915, 921 (1977) noted that "... the decision to contract—a responsibility that rests with the contracting officer alone—is inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment called for ..." and that, "effective contracting demands broad discretion." Because of the breadth of discretion given to the contracting officer in negotiated procurement, the burden of showing this discretion was abused, and that the action was "arbitrary and capricious" is certainly much heavier than it would be in a case of formal advertising.

*Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 65, 617 F.2d 590, 598 (1980) (citation omitted; omissions in original); *see also LaBarge Prods., Inc. v. West,* 46 F.3d 1547, 1555 (Fed.Cir.1995); *JWK Int'l Corp. v. United States,* 49 Fed.Cl. at 388; *Mantech*

*Telecomms. and Info. Sys. Corp. v. United States,* 49 Fed.Cl. at 64.

The United States Court of Appeals for the Federal Circuit has stated that:

> Effective contracting demands broad discretion. *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590, 598 (1980); *Sperry Flight Sys. Div. v. United States,* 548 F.2d 915, 921, 212 Ct.Cl. 329 (1977); *see NKF Eng'g, Inc. v. United States,* 805 F.2d 372, 377 (Fed.Cir.1986); *Tidewater Management Servs., Inc. v. United States,* 573 F.2d 65, 73, 216 Ct.Cl. 69 (1978); *RADVA Corp. v. United States,* 17 Cl.Ct. 812, 819 (1989), *aff'd,* 914 F.2d 271, 1990 WL 122139 (Fed.Cir.1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." *Tidewater Management Servs.,* 573 F.2d at 73, 216 Ct.Cl. 69....

*Lockheed Missiles & Space Co., Inc. v. Bentsen,* 4 F.3d at 958–59; *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d at 995; *see also Grumman Data Sys. Corp. v. Widnall,* 15 F.3d 1044, 1046 (Fed.Cir.1994).

■ The wide discretion afforded contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals. As stated by the United States Supreme Court:

> Particularly when we consider a purely factual question within the area of competence of an administrative agency created by Congress, and when resolution of that question depends on "engineering and scientific" considerations, we recognize the relevant agency's technical expertise and experience, and defer to its analysis unless it is without substantial basis in fact.

*Fed. Power Comm'n v. Florida Power & Light Co.,* 404 U.S. 453, 463, 92 S.Ct. 637, 30 L.Ed.2d 600, *reh'g denied,* 405 U.S. 948, 92 S.Ct. 929, 30 L.Ed.2d 819 (1972); *see also Compubahn v. United States,* 33 Fed.Cl. 677, 682–83 (1995) ("[T]his court is in no position to challenge the technical merit of any comments made on the evaluation sheets or decisions made during the several stages of evaluation." (footnote omitted)); *Electro–Methods, Inc. v. United States,* 7

Cl.Ct. 755, 762 (1985) (Especially "where an agency's decisions are highly technical in nature ... judicial restraint is appropriate and proper." (citations omitted)). *But cf. Cybertech Group, Inc. v. United States,* 48 Fed.Cl at 646 (Although acknowledging that the agency's decision is entitled to a presumption of regularity, stating "[t]he court must, however, perform a thorough review of even technical decisions in order to meaningfully exercise its jurisdiction." (citing *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 910–11 (Fed.Cir.1988))). As noted above, the question is not whether the court would reach the same conclusions as the agency regarding the comparison of proposals, but rather, whether the conclusions reached by the agency lacked a reasonable basis, and, thus, were arbitrary and capricious.

■■■ To prevail in a bid protest case, the protester also must demonstrate prejudice. 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"). Expanding on the prejudice requirement, the United States Court of Appeals for the Federal Circuit has held that:

To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. *See Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996); *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." *Data General,* 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." *Statistica,* 102 F.3d at 1582; *see CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1574–75 (Fed.Cir.1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award—that it was within the zone of active consideration'" (citation omitted)).

*Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.), *reh'g denied*

(1999) (citation omitted in original); *see also OMV Med., Inc. v. United States,* 219 F.3d at 1342; *Advanced Data Concepts, Inc. v. United States,* 216 F.3d at 1057; *Stratos Mobile Networks USA, LLC v. United States,* 213 F.3d 1375, 1380 (Fed.Cir.2000). In *Data General Corporation v. Johnson,* the Circuit Court wrote:

We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.... The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.

*Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996).

In the present case, the plaintiff makes three primary arguments in support of its motion for judgment on the administrative record. First, Maintenance "alleges that the Navy applied an unstated evaluation factor, the price of past contracts, in evaluating the past performance/experience of proposals" submitted in the instant solicitation. Second, Maintenance argues that "[i]f the price of past contracts can be an implied evaluation factor, then ME alleges that the factor was given an importance beyond that that can be properly applied under the Contract Disputes Act and the FAR." Third, Maintenance contends that the evaluation of the proposals was improper, arguing that

the evaluators did not consider all the facts presented, did not treat the information received fairly and reasonably, and that the individual evaluations, and the Technical Evaluation Board Report and Business Clearance Memorandum, based upon the evaluations are unreasonable and unsupported by the facts in the record.... [T]he information submitted to the Source Selection Authority was misleading, erroneous, and incomplete which makes the award

decision unreasonable and an abuse of discretion.

Regarding the improper evaluation allegation, plaintiff specifically claims that: 1) the Navy mistakenly identified Maintenance as having received a cure notice and had failed to consider the fact that MLI had been issued a cure notice; 2) both Maintenance and MLI had listed total contract price instead of the base year award price of its past contracts, but only Maintenance was downgraded for this perceived weakness; 3) the Navy improperly interpreted MLI's listing of total contract value as a base period value only, thereby inflating the total value of MLI's prior contracts; 4) the different rating scales used in the past performance questionnaires and in the TEB's technical evaluations served to diminish the ratings received by Maintenance while inflating the ratings received by MLI; 5) the Navy improperly failed to combine the prices of the two contracts on which Maintenance served as the incumbent contractor for the purposes of evaluating Maintenance's experience/past performance; 6) the Navy's consideration of both past performance questionnaires and evaluations from the CPARS database was unreasonable; and 7) the TEB provided misleading information to the SSA by failing to inform the SSA about certain weaknesses in MLI's proposal and certain strengths of Maintenance's proposal.

Plaintiff further argues that it is prejudiced by the alleged errors committed by the Navy because:

> [c]orrecting these evaluation errors and correcting the misleading statements in the Business Clearance Memorandum would make a significant impact on the award decision. Both proposals could have been rated Very Good. Even if they were rated Very Good and Exceptional, the technical difference would be much smaller than how it was erroneously presented to the Source Selection authority. Correcting these errors gives Maintenance Engineers a reasonable likelihood of being awarded the contract.

Finally, the plaintiff alleges that it is entitled to a permanent injunction because it will suffer irreparable injury, the balance of hardships tips in the plaintiff's favor, and the public interest will not be harmed by termination of the Navy's contract with MLI and subsequent award of the contract to Maintenance.

Defendant argues that it is entitled to judgment on the administrative record because "[t]he solicitation directed offerors to provide information about their past grounds maintenance contracts, including contract price," so that "[c]ontract price was not an unstated evaluation factor." Furthermore, defendant contends that "[t]he Navy properly evaluated Maintenance Engineers' past performance and experience and properly documented that evaluation."

## A. Undisclosed Evaluation Factor

The plaintiff responds that defendant violated the CICA and the FAR by applying an undisclosed evaluation factor in evaluating the experience/past performance of the bidding contractors. Specifically, the plaintiff alleges that the Navy improperly considered the prices of the past contracts performed by the bidders.

The defendant responds that the plaintiff's objection to the use of price as an evaluation factor should have been raised prior to the submission of proposals because "as a procedural matter, this allegation should be considered an untimely solicitation defect argument. Maintenance Engineers was on notice that the Navy would consider contract price in the evaluation of its experience because the solicitation required price to be provided in the past performance/experience section of the proposal." Defendant cites to *Aerolease Long Beach v. United States*, 31 Fed.Cl. 342, *aff'd*, 39 F.3d 1198, 1994 WL 572795 (Fed. Cir.1994) (table), which found that "[i]f an offeror recognizes an ambiguity or other problem in the solicitation, proper procedure dictates that the offeror challenge the problem before submission of an offer. If the offeror declines to challenge the problem, the reviewing tribunal may find that the offeror waived its right to protest," *id.* at 358. According to the plaintiff, however, at the time of the solicitation, Maintenance detected no ambiguity requiring clarification from the contracting officer prior to the submission of

bids and could not have known about an undisclosed factor. Moreover, Maintenance argues that price was not raised as an evaluation factor at all because the request for the price of past contracts contained in the solicitation was included for the purpose of obtaining sufficient information to gather past performance evaluations and not for separate evaluation purposes. From Maintenance's perspective, the Navy did not provide notice that prior to the submission of proposals that it would evaluate the price of past contracts for award. The court finds that the plaintiff's argument regarding the agency's evaluation of the price of past contracts as an undisclosed factor is timely and may be considered by the court at this time.

Both parties agree that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation. This requirement is clear and rooted in the CICA and the FAR. *See* 10 U.S.C. § 2305(b)(1) (1994) ("The head of an agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation."); 48 C.F.R. § 15.305(a) (2000) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation.").

 However, as discussed above, an agency has "great discretion in determining the scope of an evaluation factor." *Forestry Surveys and Data v. United States,* 44 Fed. Cl. 493, 499 (1999) (citing John Cibinic Jr. & Ralph C. Nash Jr., Formation of Government Contracts 830 (3rd ed.1998) and discussing law developed by the General Accounting Office). An agency "can give more weight to one contract over another if it is more relevant to an offeror's future performance on the solicited contract." *Id.* This same reasoning is adopted by this court, provided the agency official does not act arbitrarily or capriciously. Moreover, " 'a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors[.]' " *Bean Stuyvesant, L.L.C. v. United States,* 48 Fed.Cl. 303, 321 (2000) (quoting *T & S Products, Inc. v. United States,* 48 Fed.Cl. 100, 105 (2000), quoting

*Analytical & Research Tech. v. United States,* 39 Fed.Cl. 34, 45 [ (1997) ] ); *see also In re Am. Dev. Corp.,* 93–2 C.P.D. ¶ 49, at 10 (Comp.Gen.1993) (finding that the relevance of past contracts to the current solicitation could be considered in evaluating past performance although not listed as an evaluation criteria "since the RFP explicitly put offerors on notice that the comparative merit of the offerors' past performance would be evaluated to assess the probability of successful accomplishment of the work at issue here, and relevance is logically encompassed by and related to the past performance factor"). Also, in *In re AWD Techs., Inc.,* 93–1 C.P.D. ¶ 83 (Comp.Gen.1993), the Comptroller General found that the RFP's "past project experience" evaluation factor, and "the importance assigned to it by the RFP, clearly put offerors on notice that the agency intended to consider factors—such as the degree of relevance and similarity in the projects—that would demonstrate the offeror's understanding of and ability to perform the current requirement," *id.* at 6.

 An agency's consideration of whether the contractor's past performance included work on contracts of a similar size and complexity is a proper consideration in determining the degree to which the past contracts are relevant to the present evaluation. *See In re Clean Venture, Inc.,* 2000 C.P.D. ¶ 47, at 7 (Comp.Gen.2000); *In re Roy F. Weston, Inc.,* 97–1 C.P.D. ¶ 92, at 7 (Comp.Gen.1997) (upholding the consideration of the size of past and current contracts in the past performance evaluation when size was defined as "performance analogous to the dollar amount of costs incurred" in the solicitation at issue). In *Clean Venture, Inc.,* 2000 C.P.D. ¶ 47, the Comptroller General acknowledged that "a contract's size may be relevant to its complexity," *id.* at 7, and upheld the contracting officer's decision, which was based on a determination that the protester's past contracts were "relatively small and simpler to perform than this RFP work," *id.* at 3. Although the price of past contracts provides indirect information regarding the size and complexity of the offeror's past contracts, a large contract price reasonably signals that the past contract en-

compassed significant responsibilities, complexity, or both. It is reasonable for a contracting officer to conclude that a bidder who has performed past contracts of a similar price to the solicited contract has more likely performed past contracts of a similar size and complexity to the solicited, contract compared to a bidder whose past contracts have lower dollar values.

█ In the present case, section M.8 of the solicitation describes the past performance subfactor and instructs the contractors to "[p]rovide a listing of all grounds and landscape maintenance contracts or projects within the last three years" and for each contract listed, to "provide contract/project numbers and procuring agencies, the contract amount/price, name and telephone number of administering agency's Contracting Officer and technical point of contact, exact location(s) of where work was performed, contract performance period, performance evaluation for each listed contract and description of the services provided." Section M.8 also notifies the contractors that the requested information "is required to facilitate an evaluation and comparison of your qualifications with other firms submitted proposals . . . ." The plaintiff attempts to characterize the Navy's request for information simply as a method for "provid[ing] the Navy with enough information to contact the contracting officer or technical point of contact to obtain past performance information on specific contracts." However, former contract prices were specifically requested in the solicitation, and the provisions of the solicitation stated that the information requested would be considered in the evaluation and comparison of the proposals. Furthermore, section M.4 of the solicitation established that one technical subfactor reviewed by the TEB will be "[s]pecific grounds experience and past performance." This description of the first technical subfactor reasonably should have alerted the bidders to the agency's intention to consider the relevance of each bidders' prior contracts to the past performance evaluation. The contract price of past contracts was reasonably related to a determination regarding the relevance of the bidders' past contracts to the contract on which requests for proposal were being solic-

ited. Because former contract prices were specifically listed, and because the information was reasonably related to a determination of the relevance of the past contracts, the bidders were on notice that the former contract amount/price would be evaluated as part of the past performance evaluation. The Navy acted reasonably and in compliance with the CICA and the FAR when it considered the price of the bidders' past contracts.

**B. Factor Accorded Undue Weight**

█ Plaintiff alternatively argues that even if the price of past contracts was a properly disclosed evaluation factor, the Navy placed undue weight on contract price when it evaluated the bidders' proposals. Evaluating past performance based solely on the size of past contracts, without considering other indicators of complexity, may indicate an unreasonable emphasis of this factor. *See In re PMT Servs., Inc.,* 96–2 C.P.D. ¶ 98, at 6 (Comp.Gen.1996) (finding that the agency acted unreasonably when it assessed the protester's past performance as marginal "based entirely on the conclusion that PMT had not performed contracts of similar 'complexity' " and when it considered only the size of the protester's past contracts in its evaluation of complexity). However, the consideration of the size of past contracts as one factor among a number of factors related to the relevance and quality of past performance is a proper and reasonable exercise of the agency's discretion. *See Clean Venture, Inc.,* 2000 C.P.D. ¶ 47, at 7 (finding that a "fair" rating for past performance was reasonable because "the protester's good performance [on its past contracts] did not necessarily presage good performance of a much larger and more complex contract, as required by this solicitation").

█ In the present case, the record demonstrates that contract price was only one factor among many in the Navy's evaluation of the bidders' past performance. The evaluators' worksheets demonstrate that the technical evaluators also considered the quality of the performance on past contracts and the extent to which the bidders provided the

information requested in the RFP. Specifically, the TEB summary of Maintenance's experience/past performance noted that Maintenance had failed to provide a technical point of contact for its past contracts, that Maintenance had received suspensions of payment, that Maintenance's evaluations contained signs of "gold plating," and that improvement was needed in Maintenance's documentation. The TEB stated in its summary of experience/past performance that Maintenance's past performance "shows [it] meets requirements minimally," and the TEB identified numerous deficiencies in the past performance portion of Maintenance's proposal. Although the TEB Report demonstrates that the TEB also considered the value and size of Maintenance's past contracts, the TEB Report notes that Maintenance's four past performance questionnaires demonstrated an overall past performance rating of "Acceptable." One questionnaire pointed to by the TEB also noted that on one of the contracts, Maintenance had "received several payment suspensions since contract start as a result of the inability to comply with contract requirements."

In support of its argument that the dollar value of past contracts was overemphasized in the Navy's evaluation of the bids, plaintiff also compares the TEB's past performance evaluations of MLI and SLPI, despite the fact that SLPI was eliminated from the competitive range when the choice became one between Maintenance and MLI.[3] The plaintiff argues that SLPI's past performance questionnaire supported a past performance rating of "Exceptional" but that SLPI received only a "Very Good" rating because its past contracts were not as large as MLI's

past contracts. The TEB summary of SLPI's experience/past performance, however, indicated that the TEB identified other weaknesses in SLPI's past performance, including SLPI's failure to list a technical point of contact on certain projects and SLPI's lack of innovation. The record shows that although the TEB considered the fact that SLPI's "experience was of a substantially lower value and magnitude compared to the value and size of this contract," the TEB also identified other weaknesses when it determined that SLPI's past performance warranted a "Very Good" rating instead of an "Exceptional" rating. Despite the TEB's finding that the ratings on SLPI's past performance questionnaires were "Highly Acceptable," the TEB's assignment of a "Very Good" rating to SLPI appears reasonable and supported by the facts. Thus, plaintiff has not supported its assertion that SLPI's past performance rating was lowered solely because of the relatively small dollar value of its past contracts in the record.

Plaintiff cites to *Isratex, Inc. v. United States,* 25 Cl.Ct. 223 (1992), in support of its argument that the price of the bidders' past contracts was given undue weight. In *Isratex,* the court examined whether one subfactor, the hydrostatic resistance test, was given excessive weight in a manner that was inconsistent with the evaluation factors stated in the solicitation. *Id.* at 228. The *Isratex* solicitation requested the manufacture of parkas for the Department of Defense and listed four subfactors in the evaluation of the Product Demonstration Model (PDM), including the results from the hydrostatic resistance test, but did not state the relative importance of the subfactors. *Id.* PDM's

---

**3.** The TEB Report forwarded to the source selection official in the Business Clearance Memorandum provided:

One proposal by Miranda Landscaping Inc. has an overall rating of Exceptional as written. One proposal by Maintenance Engineers has an overall rating of Acceptable as written. Both proposals are considered clearly technically acceptable. Miranda Landscaping, Inc. and Maintenance Engineers showed an understanding of the contract requirements. The TEB has determined that both contractor's experience/past performance and management plans will meet or exceed the requirements of the Government. Based on the TEB findings,

these two proposals can be considered for award.

The remaining six proposals submitted by Saturn Landscaping Plus Inc.; Landscape Services Corp.; Aztec Landscape In.; ETM Services, Inc.; NMS Management Inc. and Young–Nicks Enterprises had overall ratings of Marginal. These six proposals did not reflect a clear understanding of all the contract requirements. In many instances, information required in the subfactors was not provided. Based on the TEB findings, these six proposals should not be considered for award unless further discussions are allowed.

that failed the hydrostatic resistance test, including the plaintiff's PDM, were automatically disqualified by receiving a rating of "Unacceptable." *Id.* at 226. The *Isratex* court held that 10 U.S.C. § 2305(a)(2) (1988 & Supp. II 1990)[4] "required that [the agency] weigh equally the subfactors, in the absence of a statement of their relative importance." *Id.* at 229. The court further found that " '[w]here one factor is to have predominant consideration over the other factors, this should be disclosed to the offerors.' " *Id.* at 230 (quoting *Sperry Rand Corp., Univac Div.*, No. B–179875, 74–2 C.P.D. (Fed. Pub.) ¶ 158, at 11). Because the hydrostatic resistance test was given "predominant importance," *id.* at 230, and because the solicitation did not state the relative importance of the subfactors, the *Isratex* court held that the agency improperly assigned an "Unacceptable" rating to the protester's PDM and that the agency's error was "both clear and prejudicial." *Id.* at 231.

The present case is distinguishable from *Isratex*. Although the present solicitation, like the solicitation in *Isratex*, did not state the relative importance of the past performance subfactors, the price of the bidders' past contracts was not given predominant consideration over the other sub-factors during the evaluation. The dollar value of the bidders' past contracts, unlike the hydrostatic resistance test in *Isratex*, did not become the critical or deciding factor in the evaluation of past performance. Even if a bidder had performed only past contracts of a small magnitude, the Navy in the instant case did not automatically assign an Unacceptable rating. For example, SLPI received a "Very Good" rating in the past performance subfactor even though SLPI's "experience was of a substantially lower value and magnitude." The price of past contracts was considered as one factor among several others, including the quality of performance on past contracts and the extent to which the bidders' complied with the RFP requirements. Given the fact that the TEB considered a variety of factors in evaluating Maintenance's past performance, and that the TEB identified several weaknesses other than low contract prices in Maintenance's past performance proposal, the court finds that the Navy did not afford the dollar value of Maintenance's past contracts undue weight when it assigned a rating of "Acceptable" to Maintenance in the experience/past performance subfactor.

### C. Evaluation of Experience/Past Performance

Additionally, the plaintiff raises a number of complaints regarding the Navy's evaluation of other criteria in the experience/past performance subfactor. As noted above, the actions of an agency performing government procurement will only be set aside when they are determined to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. First, the plaintiff argues that the TEB mistakenly found that Maintenance had received a cure notice and had failed to consider the fact that MLI had been issued a cure notice. Other than the evaluators' worksheets, the record before the court does not contain any definitive evidence showing that Maintenance had received a cure notice. However, the respondent for the Federal Law Enforcement Training Center contract indicated on a past performance questionnaire that Maintenance had been issued "suspension of payments—several times since contract start (not this year). Contractor not fully complying with contract requirements." Although the individual worksheets indicate that the evaluators may have incorrectly noted that Maintenance had received a

---

4. Although the *Isratex* court interpreted the version of 10 U.S.C. § 2305 which appears in the 1990 supplement of the United States Code, the most recently published edition of the United States Code shows that the relevant portions of 10 U.S.C. § 2305(a)(2) have not been amended from the 1990 supplement of the Code. The statute, 10 U.S.C. § 2305(a)(2), requires solicitations for sealed bids or competitive proposals to include a statement of:

(i) all significant factors and significant subfactors which the head of the agency reasonably expects to consider in evaluating sealed bids (including price) or competitive proposals (including cost or price, cost-related or price-related factors and subfactors, and noncost-related or nonprice-related factors and subfactors); and

(ii) the relative importance assigned to each of those factors and subfactors . . . .

10 U.S.C. § 2305(a)(2)(A)(i)-(ii) (1994).

cure notice, the fact remains that Maintenance's past performance record did contain indications of a failure to comply with contract requirements, the sort of deficiency for which a cure notice could have been issued. Had the plaintiff performed past contracts without deficiency, an erroneous belief that the plaintiff received a cure notice would have taken on greater significance. However, such was not the case. The evaluators reviewed the responses from a past performance questionnaire showing that Maintenance's deficient contract performance was not merely an isolated incident, but a problem that lasted over a period of time, requiring more than one suspension of payments. Moreover, the contracting officer who noted the suspension of payments also identified a specific weakness in Maintenance's performance by stating, "sometimes especially during the summer months, [Maintenance] doesn't appear to have enough employees to get the work done per contract." This respondent evaluated Maintenance on a contract which Maintenance was performing at the time of the solicitation and assigned Maintenance "Acceptable" ratings in ten categories and a "Marginal" rating in one category, with no "Highly Acceptable" ratings. Furthermore, the "cure notice," attributed to Maintenance in the worksheets was not reported in the final TEB Report or the Business Clearance Memorandum presented to the SSA for use in making a formal decision.

Although one respondent regarding MLI's past performance, the contract specialist on the ROICC Camp Pendleton contract, indicated that MLI had been issued a cure notice, this respondent further explained that MLI "responded effectively to solve the problem" and that "[n]o other notices were issued after the cure notice." In addition, despite the cure notice issued, this respondent assigned MLI "Highly Acceptable" scores in eight categories and "Acceptable" scores in three categories. The ROICC Camp Pendleton respondent also provided several positive comments regarding MLI's performance:

Contractor complies with the contract. Technical excellence is superb leading to high quality workmanship.... Contractor has a keen understanding of the requirements of the contract.... Contractors have excellent work relations and interface effectively w/ the customer/Government.... Contractor goes above and beyond to satisfy the customer.... Contractor was very cooperative, responsive, and highly qualified. Miranda's was a pleasure to work with.

Given the fact that the ROICC Camp Pendleton contract specialist awarded MLI the highest rating in the majority of the past performance categories and supplemented these high ratings with consistently positive remarks, it was reasonable for the TEB in the present case to discount the negative impact of the cure notice regarding MLI. The court finds that the overall tenor of the ROICC Camp Pendleton past performance questionnaire indicates that MLI was able to respond effectively to any concerns raised by contract officials and that MLI's overall work was of high quality. In contrast, the respondent who noted Maintenance's suspension of payments failed to express positive comments regarding Maintenance's ability to address concerns made by contracting officials, and on the whole, assigned mostly "Acceptable" ratings and one "Marginal" rating of Maintenance's performance. Reviewed in conjunction with the other three reports evaluating Maintenance's past performance, which also identified other deficiencies in Maintenance's past performance,[5] the TEB had a reasonable basis for distinguishing between the proposals submitted by Maintenance and MLI, even though MLI had received a cure notice and Maintenance was apparently mistakenly attributed a cure notice.

▮ Next, the plaintiff argues that both Maintenance and MLI had listed the total contract price instead of the base year award prices of their past contracts, but that only Maintenance was downgraded for this perceived weakness. The record shows that

---

5. One report on Maintenance's past performance obtained from the CPARS database contained the following comment: [REDACTED] The other

CPARS report regarding Maintenance's past performance indicated that [REDACTED].

both Maintenance and MLI listed the total prices rather than the base year award prices of their past contracts. Although the individual evaluators noted Maintenance's failure to list base year award prices as a weakness in the evaluation worksheet, this weakness was not mentioned in the TEB Report or the Business Clearance Memorandum. The TEB apparently determined that the failure to list award costs was not a weakness significant enough to be highlighted in the final reports to the source selection authority. In fact, the TEB report indicates that the TEB ultimately compared the total prices of all past contracts and not base year award prices because the TEB report recounts the total prices of each contract performed by Maintenance and MLI.[6] The record fails to show that Maintenance was downgraded for its failure to list base year award prices. Even if the evaluators committed an error by considering Maintenance's failure to list award prices as a weakness, a protester must show significant, prejudicial error to prevail. *Alfa Laval Separation, Inc. v. United States,* 175 F.3d at 1367. This apparent error, exhibited only in the evaluation worksheets and not the final report, does not rise to the level of significance required to overturn the procurement decision at issue.

In addition, the plaintiff argues that the Navy improperly interpreted MLI's listing of total contract value as a base period value only, thereby inflating the value of MLI's prior contracts. In support of this argument, plaintiff only cites to one worksheet in which the evaluator noted that MLI's past "[c]ontracts were above this contract value—8 mil (was one)." Based on this notation, plaintiff argues that the evaluator erroneously interpreted MLI's past contract prices as yearly prices because "[t]he total price of [the present contract] is over 15 million dollars so the evaluator must have believed the contract was for 8 million dollars a year." Plaintiff adds that "[a]s none of the evaluators commented on Miranda giving total contract

prices, as they did with Maintenance Engineers, they all appear to believe Miranda's contract amounts were yearly prices." The record does not support plaintiff's assertions. MLI's proposal shows that its largest past contract had a total dollar value of $7,558,085.00 for the first contract and a total dollar value of $8,539,560.00 for the follow-on contract. Although the solicitation requested "the contract amount/price" of the past contracts without specifying whether the agency required total prices or base year award prices, the TEB report shows that the TEB considered the value of the bidders' past contracts in a consistent manner by including the same information, the total value of the past contracts, for each bidder in the final report. Both Maintenance and MLI had provided the total values of their past contracts instead of award prices, and the TEB reviewed both bidders' experience/past performance based on these total values. Moreover, the TEB Report listed the values of MLI's past contracts in accordance with MLI's proposal, without adding any additional value for any additional years.

The plaintiff next argues that the different rating scales used in the past performance questionnaires and in the TEB's technical evaluations served to discount the ratings received by Maintenance, while inflating the ratings received by MLI. The plaintiff contends that "[i]t was unreasonable to send out questionnaires with a four point rating scale instead of the five point scale used in the technical evaluations." The plaintiff further asserts that although Maintenance's past performance questionnaires showed mostly "Acceptable" ratings, an "Acceptable" rating on the questionnaires' four-point scale is higher than an "Acceptable" rating on the five-point scale used by the TEB to conduct the technical evaluation. Through this argument, the plaintiff seems to imply that the TEB erred by directly transferring the "Acceptable" rating from the questionnaires to the "Acceptable" rating in the final technical evaluation. The past performance question-

---

6. In the technical evaluation of MLI, the TEB report stated: "Past performance included six contracts in the multi-million dollar range of $9 million, $8.5 million, $3.7 million, $2.9 million, $2.8 million and $2.4 million." Regarding Main-

tenance's past performance, the TEB report provided: "Past performance within the past three years included contracts varying in size from $2.5 million, $1.8 million, $1.7 million, $1.5 million, $1.3 million and $1.1 million."

naires requested respondents to assign adjectival ratings for different aspects of the contractor's performance on the following four-point scale: Highly Acceptable, Acceptable, Marginal and Unacceptable. The Source Selection Plan, however, required the TEB to assign an overall rating for each proposal using the following five-point scale: Exceptional, Very Good, Acceptable, Marginal and Unacceptable.

 Contracting officers exercise broad discretion in the evaluation process and in deciding which bid is most advantageous to the United States. *See Lockheed Missiles & Space Co., Inc. v. Bentsen*, 4 F.3d at 958–59. In *Arctic Slope World Servs., Inc.*, 2000 C.P.D. ¶ 75 (Comp.Gen.2000), the Comptroller General upheld the award of a contract in which the scale used in the past performance evaluation was significantly different from the rating scales used in the underlying documents. In *Arctic Slope*, the contracting officer assigned past performance ratings based on a five-point color/adjectival scale, *id.* at 2, which resulted from consideration of past performance questionnaires using a numerical rating scale as well as CPARS reports containing an adjectival rating scale, *see id.* at 11. The plaintiff has not identified any case or rule which requires the government to distribute past performance questionnaires based on a rating scale identical to the ultimate evaluation. Moreover, even if the second-highest rating on a four-point scale should not be equated to the third-highest rating on a five-point scale, the record does not show that the Navy gave Maintenance a rating of "Acceptable" for experience/past performance based on a direct transfer of the ratings indicated on the past performance questionnaires. The summary of the experience/past performance subfactor completed by the TEB provides the following rationale for assigning Maintenance a rating of "Acceptable": "PP [Past performance] shows he meets requirements minimally.... Experience is there. No P.O.C. [technical point of contact].... Does have ~~cure notice~~ and suspension of payment. Improvement needed in documentation; Good communication. PPQ [Past performance questionnaire] comments show sign of risk." (strike out in original). The record shows that the TEB considered the ratings on the past performance questionnaires in conjunction with other factors which warranted an "Acceptable" rating. Thus, the Navy had a reasonable basis for assigning an "Acceptable" rating to Maintenance for experience/past performance, and it was not error for the Navy to distribute past performance questionnaires containing a rating scale different from the scale used in the technical evaluation. The plaintiff's argument in this regard is not persuasive. Maintenance Engineers has failed to demonstrate impropriety on the part of the defendant or prejudice to the plaintiff.

 Additionally, the plaintiff contends that the evaluation of past performance was flawed because the Navy's failure to combine the prices of the two contracts on which Maintenance served as the incumbent contractor was unreasonable. Plaintiff argues that the two contracts on which Maintenance was an incumbent should have been combined because the contracts "were run concurrently and showed an ability to manage and coordinate a contract of the combined size being performed at two locations that would have to be managed and coordinated on the new contract." In support of its assertion, plaintiff cites to *Seattle Security Services, Inc. v. United States*, 45 Fed.Cl. 560 (2000). In *Seattle Security Services*, the court reviewed the evaluation and award process employed by the government in a solicitation for "armed guard services at a number of federal office buildings and courthouses in the states of Washington and Oregon." *Id.* at 562. This solicitation covered security services which were previously provided under two separate contracts, one for Washington and one for Oregon, and the plaintiff was the incumbent contractor on both contracts. *Id.* As part of the agency's past performance evaluation, the contracting officer contacted the contract references listed by each bidder and asked each reference the same five questions, including the number of buildings or sites for which the offeror provided services and the number of guard posts provided by the offeror on the prior contract. *Id.* at 564. In evaluating the number of buildings and the number of guard posts serviced by the

bidder, the agency set a threshold requirement for each factor and awarded one point to the bidder for each factor if it met the respective threshold requirement; otherwise no points were awarded. *Id.* Regarding the plaintiff's past performance, the agency contacted only the contracting officer on the Washington contract, but not on the Oregon contract. *Id.* The *Seattle Security Services* court found that the agency's failure to consider the two contracts for which the protester was the incumbent in combination met the arbitrary and capricious standard. *Id.* at 567. The court reasoned that

> by failing to consider the two contracts in combination, the CO necessarily cost the plaintiff two points on the evaluation form—one on each of the first two questions. Those questions awarded a point on the basis of whether the contract examined involved a similar number of buildings and guards as the projected contract. Not surprisingly, by examining only the Washington contract, and excluding the Oregon contract, the CO awarded plaintiff no points on these first two questions—this despite the fact that it was known that plaintiff was the incumbent on the two contracts that were being combined to produce the new contract.

*Id.*

The agency in *Seattle Security Services* deducted points from the plaintiff for not servicing at least as many buildings and guard posts required by the solicitation. However, as the incumbent for the entire area of solicited services, the protester had obviously serviced as many buildings and guard posts as were required by the solicitation.

In the present case, the failure to combine Maintenance's two incumbent contracts did not result in the same detriment faced by the plaintiff in *Seattle Security Services.* Here, there is no evidence that the Navy automatically downgraded the bidders based on a

threshold requirement of contract price. Moreover, even if the agency had erred by failing to consider two of Maintenance's past contracts in combination, the plaintiff must demonstrate that it was prejudiced by the government's unreasonable action. *Alfa Laval Separation, Inc. v. United States,* 175 F.3d at 1367. If the Navy had combined the two contracts which were included as part of the current solicitation, Maintenance's past performance record would have contained five contracts with the following total values: $3,822,000.00, $1,852,000.00, $1,760,000.00, $1,523,856.93 and $1,100,000.00.[7] The size of Maintenance's past contracts would still have been compared to the size of MLI's past contracts, which contained six contracts in the multi-million dollar range: $9,118,500.00, $8,539,560.00, $3,786,300.00, $2,901,032.00, $2,800,752.00, $2,496,400.00.

As noted above, the price of past contracts may be considered as one factor when evaluating whether the contractor has the experience necessary to effectively perform a contract of the same size and complexity of the current contract. *In re Clean Venture, Inc.,* 2000 C.P.D. ¶ 47; *In re AWD Technologies, Inc.,* 93–1 C.P.D. ¶ 83. Even if the TEB had reviewed the two contracts on which Maintenance served as the incumbent in combination, Maintenance's largest contract of $3.8 million would represent only twenty-five percent of the value of the present solicitation. Moreover, in comparison to the greater number of large contracts performed by MLI during overlapping time periods, it is reasonable to conclude that MLI had more extensive experience with handling contracts of a similar size and/or complexity to the contract in the solicitation. Even if Maintenance's two contracts had been combined, the agency was justified in concluding that MLI's past contracts demonstrated more relevant experience with contracts of a similar magnitude to the contract at issue when compared to Maintenance's past experience with contracts

---

7. At the January 17, 2001 status conference, counsel for defendant represented that one of the six contracts listed in Maintenance's Non–Price Proposal, the Miramar Naval Air Station contract, was not considered by the Navy because performance on this contract occurred prior to the three-year window of time identified in the solicitation. The TEB, however, apparently considered all six of Maintenance's listed contracts because the TEB Report acknowledges all six contracts and lists the prices for all six contracts, despite the fact that one contract occurred outside the three-year window.

of a lesser magnitude. Thus, Maintenance has not demonstrated that it was prejudiced by this alleged error.

Next, the plaintiff contends that the Navy's consideration of both past performance questionnaires and evaluations from the CPARS database to evaluate past performance resulted in an "unreasonable, arbitrary and capricious evaluation because the proposals were not evaluated using consistent information as required by *Seattle Security*." In *Seattle Security Services*, 45 Fed. Cl. 560, the contracting officer conducted a past performance review using a five-question evaluation form and assigned points based on the form. *Id.* at 564. The contracting officer indicated that she had also considered three letters of recommendation that the awardee had attached to its offer, but apparently did not complete an evaluation form or assess points for any of these recommendations. *Id.* The court found that "the CO does not have the discretion to employ a rigid point system for evaluating one bidder's references and not use the same system to evaluate another bidder's references." *Id.* at 570. The court concluded that "the CO acted unreasonably in employing the evaluation forms as to plaintiff's references, but not employing the same forms in evaluating [the awardee]'s references." *Id.* at 570.

*Seattle Security Services* states that "[a]n agency has discretion to determine the scope of the offeror's performance history to be considered provided all proposals are evaluated consistently." *Id.* at 569 (citing *Pac. Ship Repair and Fabrication, Inc.*, B–279293, 98–2 C.P.D. ¶ 29). The *Seattle Security Services* court further explained that, " 'the contracting agency must treat all offerors equally; it must evaluate offers even-

handedly against common requirements and evaluation criteria.' " *Id.* (quoting *U.S. Prop. Mgmt. Serv. Corp.*, B–278727, 98–1 C.P.D ¶ 88 at 4). The Navy's actions in the present case are entirely consistent with the holding of *Seattle Security Services*. The Navy followed a consistent procedure and employed consistent criteria in evaluating each of the bidders' experience/past performance. The contracting officer sent the same past performance questionnaire to all the points of contact listed by each bidder. In addition, the contracting officer searched the CPARS database for past performance evaluations for all the contractors. Thus, the contracting officer pursued two routes to obtain past performance information for the contractors, but these two routes were employed for every contractor. Although the two methods employed by the Navy to obtain past performance information resulted in a different number of returned past performance questionnaires and CPARS reports for each contractor, it was reasonable for the Navy to rely upon the questionnaires that were completed and returned and upon the reports available on the CPARS. The Navy could not compel past contracting officers to return completed questionnaires or to unilaterally change the reporting requirements of past performance reports on the CPARS.

Moreover, the *Seattle Security Services* court explained that the contracting officer erred by employing "a rigid point system for evaluating one bidder's references and not us[ing] the same system to evaluate another bidder's references." *Id.* at 570. In the present case, both the past performance questionnaires and the CPARS report presented evidence in the form of adjectival ratings and written comments. Although the adjectival rating scales were not identical,[8]

---

8. The FAR establishes a system for recording and maintaining information regarding contractors' performance on government contracts. *See* 48 C.F.R. § 42.1500–42.1503 (2000). Pursuant to the FAR, the Navy has established certain procedures for the completion of past performance reports which are maintained on a CPARS database, including scoring offerors based on the following five-point scale: Exceptional, Very Good, Satisfactory, Marginal, and Unsatisfactory. Department of the Navy, Contractor Performance Assessment Reporting System (CPARS) Attachment 4 (2000), *available at*

*www.cpars.navy.mil/cparsfiles/digita_s.pdf.* The two CPARS reports received on behalf of Maintenance evaluated Maintenance's performance on a contract at Naval Station, San Diego, CA for two different time periods. The reports evaluating Maintenance's performance included ratings of "Very Good" and "Satisfactory" consistent with the scale set forth in the Navy's CPARS manual. As noted above, the past performance questionnaires presented a four-point rating scale which included ratings of "Highly Accept-

the two forms requested information on similar aspects of past performance such as quality of service, cost control, business relations, and timeliness of performance, and both forms provided opportunities for the evaluators to make written comments regarding the rationale behind the ratings assigned. Thus, the past performance questionnaires and the CPARS reports provided the Navy with information in a similar form for all contractors. The Navy then used this past performance information to evaluate all the bidders on the same five-point adjectival rating scale. The court finds that the Navy acted reasonably and applied consistent methods to obtain past performance information to all eight offers.

The plaintiff also argues that the TEB provided misleading information to the SSA by failing to inform the SSA about certain weaknesses in MLI's proposal and certain strengths in Maintenance's proposal. Specifically, the plaintiff asserts that the TEB should have informed the SSA that MLI had received a cure notice, that Maintenance had received a high rating on one contract that was being incorporated into the present contract, and that Maintenance had received "Acceptable" ratings based on a four-point scale, not a five-point scale. As discussed above, it was reasonable for the TEB to discount the cure notice received by MLI and for the TEB to represent that Maintenance's past performance evaluations demonstrated Acceptable ratings on the whole. Moreover, the evaluators' consideration of past performance ratings on a four-point scale and the incorporation of these ratings into an overall past performance evaluation on a five-point scale was applied to all eight offers and was not arbitrary or capricious. The plaintiff also asserts that the SSA should have been informed that MLI had failed to identify whether it was a prime contractor or a subcontractor on its list of past contracts. In the TEB's summary of MLI's experience/past performance, however, the TEB noted that MLI had failed to provide "sub/prime labels" in its list of its past contracts, but that the TEB "could determine [MLI] was prime from PPQ's [past performance questionnaires]." Thus, the record shows that the TEB considered this potential weakness, had a reasonable basis for discounting it and for not informing the SSA that MLI had failed to state whether it served as the prime or the subcontractor in its list of past contracts.

Furthermore, the plaintiff argues that the SSA should have been informed that Maintenance was performing two of the contracts incorporated into the present contract and that one of the questionnaires giving MLI high ratings involved a small contract. As noted above, the agency has the discretion to determine what constitutes an advantage over other proposals. *See Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d at 959; *Commercial Energies, Inc. v. United States,* 20 Cl.Ct. at 145. The TEB considered the past performance information it received and summarized its findings to the SSA. According to the source selection plan, the TEB was responsible for preparing "a final TEB narrative to support total technical evaluation adjectival ratings assigned to each proposer by identifying the specific strengths, weaknesses, and deficiencies of each proposal." The TEB had the discretion to identify what it perceived as strengths, weaknesses, and deficiencies in compliance with the criteria set out in the solicitation. The plaintiff does not claim that information in the final TEB Report or the Business Clearance Memorandum provided to the SSA was inaccurate, and the court has not identified any incorrect information in the documents provided to the SSA. Moreover, the court finds that the contracting officer acted reasonably in explaining the rationale behind her recommendation contained in the business clearance memorandum, identifying the key strengths and weaknesses in each contractor's proposal.

After reviewing all of the plaintiff's arguments regarding the alleged improprieties in the evaluation process, the court finds that the government's evaluation of the technical proposals was not conducted improperly and that the Source Selection Authority's conclusion and the contracting officer's decision to award the contract to MLI had a reasonable

able," "Acceptable," "Marginal," and "Unaccep-

table."

basis and was neither arbitrary nor capricious.

### D. Prejudice

Plaintiff further argues that the cumulation of the errors it has alleged occurred during the evaluation process resulted in prejudice against the plaintiff. The only issues which might raise questions as to the agency's actions involve the identification by the individual evaluators of a cure notice issued to Maintenance, the identification of Maintenance's listing of total prices instead of award prices of its past contracts as a weakness and the agency's failure to combine the prices of the two past contracts on which Maintenance performed as the incumbent for the past performance evaluation. Without making such a finding, even if the agency did in fact err in these three respects, as discussed more fully above, the errors were *de minimis*. Moreover, even considered together, these events did not prejudice the plaintiff under the present circumstances. As stated by the United States Court of Appeals for the Federal Circuit, "[s]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement." *Grumman Data Sys. Corp. v. Widnall*, 15 F.3d at 1048 (citing *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d at 960). Such small and limited alleged missteps committed by the Navy would not constitute significant errors and would be insufficient to meet the plaintiff's burden of showing "that there was a substantial chance it would have received the contract award but for that error." *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed.Cir.1996).

 The plaintiff also contends that both MLI's and Maintenance's "proposals could have been rated Very Good. Even if they [Maintenance] were rated Very Good and [MLI] Exceptional, the technical difference would be much smaller than how it was erroneously presented to the Source Selection authority." Thus, even under plaintiff's view of the facts, Maintenance would not have received a rating higher than "Very Good" in the experience/past performance subfactor. Although the plaintiff has raised alleged weaknesses in MLI's proposal, the record demonstrates that the government had a reasonable basis for discounting these alleged weaknesses and awarding MLI an "Exceptional" rating. Even if Maintenance had been given a "Very Good" rating in the experience/past performance subfactor, Maintenance would not have had a substantial likelihood of being awarded the contract.

Pursuant to the evaluation scheme established by the solicitation, the technical evaluation ratings became the most significant factor in the evaluation process. Section M.4 of the solicitation explained the relative importance of the evaluation factors, and in pertinent part, stated: "If the technical differences among competing offers are significant, but the differences in prices are insignificant, then technical factors will be the most influential factors in determining best value." Conversely, "[i]f technical differences among proposals are insignificant, but price differences are significant, then price will be the most influential factor."

The record before the court indicates that the agency viewed the differences in price as relatively minor. The contracting officer "determined that offerors' prices were reasonable and balanced" and that "the pricing of all the offerors' proposals appears to be realistic." Moreover, the contracting officer found that MLI's price, which was approximately five million dollars below the government estimate, was a "very competitive price." The minutes taken at Maintenance's post award debriefing on September 25, 2000 indicate that the contracting officer stated that "the SSB and SSA looked at the difference in price [between MLI and Maintenance] to be minimal." Given that MLI's price was only seven percent higher than Maintenance's price, it was reasonable for the agency to emphasize technical factors in its determination of best value. Furthermore, the Business Clearance Memorandum demonstrates that the agency was concerned about awarding to a contractor which presented, in its view, a technical risk. The agency stated that "[i]f the Government took the risk to award to ME [Maintenance] and if they didn't succeed in the administration and quality control, any damage that might occur to the landscape of all the areas would result

to increasing the Governments [sic] administrative costs."

Even after making the adjustments for the alleged errors in the evaluation of the experience/past performance subfactor, under the plaintiff's own interpretation, Maintenance would have received two "Very Good" ratings in the technical subfactors of past performance and management/administration plan, compared to the two "Exceptional" ratings awarded to MLI in the two technical subfactors. Because of the less significant differences between the prices of the proposals and the emphasis by the agency on technical quality, MLI still would have been awarded the grounds maintenance contract at issue. Thus, the plaintiff has not demonstrated that it was prejudiced by any alleged errors in the technical evaluation of experience/past performance, that is, the plaintiff has not demonstrated a "substantial chance" of receiving the award but for the cited errors. *Statistica, Inc. v. Christopher,* 102 F.3d at 1582.

### III. Injunctive Relief

The plaintiff requests injunctive relief based on the above alleged government errors in the evaluation of the proposals. Injunctive relief for a disappointed bidder is appropriate " 'only in extremely limited circumstances.' " *CCL Serv. Corp. v. United States,* 48 Fed.Cl. 113, 120 (2000) (quoting *CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1581 (Fed.Cir.1983) (quoting *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1372 (Fed.Cir.1983))); *Mantech Telecomms, and Info. Sys. Corp. v. United States,* 49 Fed.Cl. at 64 (citing *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (emphasizing that injunctive relief is not routinely granted)). Because injunctive relief is extraordinary in nature, a plaintiff must demonstrate the right to such relief by clear and convincing evidence. *Overstreet Elec. Co. v. United States,* 47 Fed.Cl. 728, 732 (2000) (citing *Bean Dredging Corp. v. United States,* 22 Cl.Ct. 519, 522 (1991)); *Seattle Sec. Servs., Inc. v. United States,* 45 Fed.Cl. at 566; *Delbert Wheeler Constr., Inc. v. United States,* 39 Fed.Cl. 239, 251 (1997), *aff'd,* 155 F.3d 566, 1998 WL 244202 (Fed.Cir.1998) (table); *Compliance Corp. v. United States,* 22 Cl.Ct. 193, 206 & n. 10 (1990), *aff'd,* 960 F.2d 157, 1992 WL 56946 (1992) (table); *but see Magnavox Elec. Sys. Co. v. United States,* 26 Cl.Ct. 1373, 1378 & n. 6 (1992).

In order to obtain a temporary restraining order or preliminary injunction, the plaintiff must carry the burden of establishing entitlement to extraordinary relief based on the following factors:

> (1) the likelihood of plaintiff's success on the merits of its complaint; (2) whether plaintiff will suffer irreparable harm if the procurement is not enjoined; (3) whether the balance of hardships tips in the plaintiff's favor; and (4) whether a preliminary injunction will be contrary to the public interest.

*ES–KO, Inc. v. United States,* 44 Fed.Cl. 429, 432 (1999) (citing *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993)); *Labat–Anderson Inc. v. United States,* 2001 WL 862686, at *8; *OAO Corp. v. United States,* 49 Fed.Cl. 478, 480 (2001) (" 'When deciding if a TRO is appropriate in a particular case, a court uses the same four-part test applied to motions for a preliminary injunction.' " (quoting *W & D Ships Deck Works, Inc. v. United States,* 39 Fed.Cl. 638, 647 (1997))); *Dynacs Eng'g Co. v. United States,* 48 Fed.Cl. at 616. The United States Court of Appeals for the Federal Circuit, in *FMC Corporation v. United States,* further noted that:

> No one factor, taken individually, is necessarily dispositive. If a preliminary injunction is granted by the trial court, the weakness of the showing regarding one factor may be overborne by the strength of the others. If the injunction is denied, the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial.

*FMC Corp. v. United States,* 3 F.3d at 427 (citations omitted).

The test for a permanent injunction is almost identical to that for a temporary restraining order or preliminary injunction, but rather than the likelihood of success on the merits, a permanent injunction requires success on the merits. The court in *Bean Stuy-*

*vesant, L.L.C. v. United States* set out the test:

(1) [A]ctual success on the merits; (2) that [plaintiff] will suffer irreparable injury if injunctive relief were not granted; (3) that, if the injunction were not granted, the harm to plaintiff outweighs the harm to the Government and third parties; and (4) that granting the injunction serves the public interest.

*Bean Stuyvesant, L.L.C. v. United States,* 48 Fed.Cl. at 320–21 (citing *Hawpe Constr., Inc. v. United States,* 46 Fed.Cl. 571, 582 (2000) (citing *FMC Corp. v. United States,* 3 F.3d at 427), *aff'd,* No. 00–5103, 2001 WL 638450 (Fed.Cir. June 8, 2001)); *see also ATA Defense Indus., Inc. v. United States,* 38 Fed. Cl. 489, 505 n. 10 (1997) (" 'The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.' " (quoting *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987))).

The decision as to whether or not to grant an injunction is within the sound discretion of the trial court. *FMC Corp. v. United States,* 3 F.3d at 427; *Asociacion Colombiana de Exportadores de Flores v. United States,* 916 F.2d 1571, 1578 (Fed.Cir.1990). Once injunctive relief is denied, "the movant faces a heavy burden of showing that the trial court abused its discretion, committed an error of law, or seriously misjudged the evidence." *FMC Corp. v. United States,* 3 F.3d at 427. Significantly, the Federal Circuit in *FMC Corporation* also noted that: "Absent a showing that a movant is likely to succeed on the merits, we question whether the movant can ever be entitled to a preliminary injunction unless some extraordinary injury or strong public interest is also shown." *Id.*

The court has reviewed plaintiff's allegations of government errors in the evaluation of proposals and has found that the plaintiff is not entitled to the relief it seeks. Regarding the irreparable injury factor, the plaintiff argues somewhat too simplistically, that "[c]ourt[s] have consistently held that the loss of a contract opportunity constitutes irreparable injury." The plaintiff, however, has not demonstrated that it has lost a contract opportunity to which it is entitled. In addition, the plaintiff argues that an award of injunctive relief would not damage the public interest, but cannot claim that some strong public interest favors an award of injunctive relief. Because the court finds that the award at issue by the Navy was not arbitrary or capricious, nor an abuse of agency discretion, the public interest is best served by leaving undisturbed the agency award decision. Injunctive relief in favor of the plaintiff is unwarranted.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for permanent injunctive relief is **DENIED**. The defendant's motion for judgment on the administrative record is **GRANTED**. The Clerk of the Court is directed to enter judgment in favor of the defendant. Each party shall bear its own costs.

**IT IS SO ORDERED.**